UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JOHN J. ZENT, | ) |
| | ) |
|      **Plaintiff,** | ) |
| | ) |
| v. | )    CAUSE NO.: 1:10-cv-80 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
|      **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff John J. Zent appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED and the case will be REMANDED for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Zent applied for DIB on April 5, 2006, alleging a disability onset date of January 1, 2004. (Tr. 99-101.) The Commissioner denied his application initially and upon reconsideration, and Zent requested an administrative hearing. (Tr. 89-92, 94-97.) Administrative Law Judge ("ALJ") John Pope conducted a hearing on October 7, 2008, at which Zent, who was represented by counsel; Tonya Zent, the claimant's wife; Jeremy Edward Zent, the claimant's son; and Amy Kutschbach, a vocational expert ("VE") testified.[2] (Tr. 53-85.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] In the transcript of the administrative hearing, the VE is misidentified as Ann Trzynka. Ms. Trzynka is actually the claimant's lawyer.

On November 28, 2008, the ALJ rendered an unfavorable decision to Zent, finding that he was not under a disability from his alleged onset date of January 1, 2004, through his date last insured of June 30, 2004. (Tr. 20-28.) The Appeals Council denied Zent's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.) Zent filed a complaint with this Court on March 22, 2010, seeking relief from the Commissioner's decision. (Docket # 1.)

## II. FACTUAL BACKGROUND[3]

### A. Background

Zent was born on August 30, 1954, and was 49 years old as of his alleged onset date. (Tr. 99.) Zent turned 50 years old exactly two months after his June 30, 2004, date last insured. He completed the 11th grade in 1971 and has past relevant work experience as a carpenter. (Tr. 159.) Zent alleges that he became disabled due to problems with his heart and breathing, diabetes, high blood pressure, sleep apnea, and morbid obesity. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Br.") 2.)

### B. Zent's Medical History

In January 2003, Zent was admitted to Lutheran Hospital for evaluation and treatment of possible obstructive sleep apnea. (Tr. 194-96.) His physicians noted that he had a history of coronary artery disease, hypertension, morbid obesity, and type 2 diabetes mellitus. (Tr. 195.) At admission, Zent weighed 447 pounds and had a Body Mass Index of 60.6. (Tr. 194.) A polysomnogram revealed that Zent had obstructive sleep apnea, and he was prescribed the use of a nasal Continuous Positive Airway Pressure machine and supplemental oxygen. (Tr. 194.)

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 500-page administrative record necessary to the decision.

In May 2003, Zent presented to Lutheran Hospital with chest pains. Doctors noted that his complaints were consistent with a diagnosis of unstable, progressive angina. (Tr. 190-91.) Zent's physicians also documented that he was morbidly obese with a history of coronary disease and that he had undergone stinting in 2000. (Tr. 180, 190-91.) Zent's chest pains were treated with intravenous nitroglycerin. (Tr. 190.) Dr. Basil Genetos performed a left heart catheterization and stenting on Zent with excellent results. (Tr. 180, 182-83.) Dr. Genetos diagnosed Zent with multivessel coronary artery disease with mild generalized left ventricular dysfunction, prescribed Plavix, and strongly encouraged Zent to stop smoking and lose a considerable amount of weight. (Tr. 181, 183.)

Zent was next seen by Dr. Kevin Hart, his treating cardiologist, in July 2003 for a follow-up appointment. (Tr. 485.) Zent stated that he was feeling well but reported that he was still smoking two packs of cigarettes every day. (Tr. 485.) Dr. Hart counseled Zent on the need to lose weight and stop smoking. (Tr. 485.)

Zent was again admitted to Lutheran Hospital with complaints of chest pains in October 2003. (Tr. 175-77.) The chest pains were resolved with a nitroglycerin drip. (Tr. 175.) Cardiac enzymes and an echocardiogram did not reveal any significant findings and Zent's physicians noted that he weighed 425 pounds and continued smoking a pack of cigarettes per day. (Tr. 175-76.) Zent also received a cardiac catheterization in October 2003 without complication. (Tr. 167-68.) His physicians found that he had multivessel coronary artery disease, but not significant obstructive disease. (Tr. 168.) Zent's left ventricular systolic function was reported as normal, nitrates were added to his medication regime, and he has again urged to quit smoking. (Tr. 168.)

In February 2004, Zent was admitted to the Parkview Hospital Emergency Room with

complaints of an accelerated heart rate, chest pain, and difficulty breathing. (Tr. 435.) A physical examination was largely unremarkable, but did note some trace swelling with minimal pitting in the lower extremities. (Tr. 435-36, 439.) Zent's physicians noted that he had previously smoked four packs of cigarettes per day and was still smoking one pack per day. (Tr. 435.) Clinical testing ultimately did not reveal any cardiac abnormalities. (Tr. 438, 442.) Upon discharge, Zent's physicians noted that he was able to walk without chest pain or shortness of breath. (Tr. 442.)

Dr. Hart saw Zent for a follow-up appointment in March 2004. (Tr. 483-84.) Dr. Hart noted that Zent had shortness of breath upon exertion, but did not have obstructive disease or restenosis in his stents. (Tr. 483.) Dr. Hart again emphasized to Zent that he needed to make changes in his lifestyle, including losing weight and quitting smoking. (Tr. 484.)

Zent returned to Parkview Hospital in May 2004 with complaints of heavy chest discomfort. (Tr. 406-7.) The attending physicians noted that Zent had been noncompliant with his treatment and continued to smoke. (Tr. 406.) An echocardiogram was performed and returned negative results. (Tr. 409.) A cardiac catheterization was performed on May 6, 2004, and it was found that Zent had normal left ventricular function without mitral regurgitation and normal left anterior descending and left circumflex with minimal non-obstructive disease in the right coronary. (Tr. 409, 420-21.)

A CT scan was also performed on Zent in May 2004, which indicated that he was experiencing swollen lymph nodes in his chest. (Tr. 379-80, 414.) Zent's physicians scheduled him for a left thoracotomy and mediastinal exploratory surgery. (Tr. 382, 394-95.) However, because of Zent's morbid obesity, the surgeon determined that he would be unable to perform the mediastinal exploration. (Tr. 394.) The left thoracotomy was performed, but the surgeon was

unable to locate the lymph nodes. (Tr. 394-95.)

In November 2004, Zent was seen by Dr. Hart, who noted that Zent was doing well from a cardiac standpoint.[4] Dr. Hart did, however, state that Zent had still not stopped smoking and had not lost any weight, despite his repeated admonitions to do so. (Tr. 481.) Dr. Hart concluded that Zent's condition was stable and that there was no need to add to his treatment regime. (Tr. 481.)

Zent was seen by Dr. Zehr in December 2004 for a follow-up examination of his mediastinal adenopathy. (Tr. 216-17.) Zent complained of chronic shortness of breath. (Tr. 216.) A CT scan of Zent's chest revealed minor granulomas in his lungs and swelling of the lymph nodes. (Tr. 376.) Spirometry testing was conducted, and it indicated that Zent had a moderate to severe obstructive ventilatory defect with some improvement in flow with bronchodilators. (Tr. 216.) Dr. Zehr prescribed a Combivent inhaler and again told Zent to quit smoking. (Tr. 216.)

In February 2005, Zent received another cardiac catheterization, which revealed no significant coronary artery disease and normal left ventricular systolic function. (Tr. 364-65.) Pulmonary function testing was done in May 2005, which indicated that Zent had moderately severe obstructive airways disease. (Tr. 221.) In June 2005, Zent was seen by Dr. William Collis, a treating cardiologist, who reported that he was doing fairly well. (Tr. 479.) Dr. Collis recorded that Zent complained of occasional chest pains, although Zent's description of the pains suggested they were non-cardiac in origin. (Tr. 479.)

Zent saw Dr. Hart again in July 2006. (Tr. 478.) Dr. Hart noted that Zent was stable from a cardiac standpoint and his treatment plan did not require modification. (Tr. 478.) Zent reported that he was not experiencing any chest discomfort, and Dr. Hart observed that Zent had still not

---

[4] Zent's insured status under the Act expired on June 30, 2004.

lost weight or quit smoking. (Tr. 478.)

In July 2006, Dr. James Ingram, Zent's treating family physician, wrote a letter in support of his application for disability benefits. (Tr. 475.) Dr. Ingram noted that Zent weighed 438 pounds in January 2006, had a history of coronary artery disease, chronic obstructive pulmonary disease ("COPD"), hypertension, diabetes mellitus, and significant tobacco abuse. (Tr. 475.) He reported Zent's prior complaints of being unable to walk for more than fifty feet without experiencing shortness of breath. (Tr. 475.) Dr. Ingram believed that with Zent's difficulty breathing, intermittent chest discomfort with exertion, and chronic ankle and lower extremity swelling, Zent would be unable to perform gainful employment. (Tr. 475.)

In July 2006, Dr. J. Sands, a state agency reviewing physician, stated that Zent did not have a severe impairment and was not severely limited prior to his date last insured of June 30, 2004. (Tr. 476.) Similarly, in January 2007, Dr. M. Brill affirmed Dr. Sands's prior opinion and also stated that the medical evidence of record prior to June 30, 2004, did not support a finding of disability. (Tr. 502.)

In August 2008, Dr. Ingram completed a Medical Assessment form addressing Zent's functional abilities. Dr. Ingram noted that Zent weighed 470 pounds and claimed to experience shortness of breath even while at rest. (Tr. 505.) Dr. Ingram found that Zent had marked limitation in physical activity and that he was incapable of even performing "low stress" jobs. (Tr. 506.) He believed that Zent was capable of sitting less than two hours in an eight hour workday and was able to stand and walk less than two hours in an eight hour workday. (Tr. 507.) Dr. Ingram also opined that Zent was incapable of lifting more than ten pounds, could rarely twist his body, and could never stoop, crouch, squat, or climb. (Tr. 507.) He believed that Zent would need to shift positions from sitting, standing, or walking at will and would need to take

unscheduled breaks multiple times per hour. (Tr. 507.) Dr. Ingram opined that Zent would need to elevate his legs above his heart throughout the entire day and must avoid any exposure to extreme temperatures, high humidity, wetness, cigarette smoke, perfumes, solvents, cleaners, fumes, odors, gases, dust, chemicals, and other respiratory irritants. (Tr. 508.)

*C. Zent's Hearing Testimony*

On October 7, 2008, Zent appeared with counsel and testified before ALJ John Pope. (Tr. 53-85.) Zent testified that he stopped doing construction work in 2003 because his obesity, coronary disease, COPD, sleep apnea, and diabetes made it too difficult to physically perform the work. (Tr. 60-62.) He stated that he had difficulty with standing and walking, but not with sitting. (Tr. 62.) Zent also claimed that although he did not believe he could carry any weight, he was able to lift 20 or 30 pounds. (Tr. 62.)

Zent then testified that during his period of alleged disability in 2004, he generally spent most of his time sitting around his house. (Tr. 66.) He sometimes fished in a pond in his back yard and enjoyed coloring. (Tr. 66-67.) He testified that he was generally able to take care of his personal hygiene and dress himself, make simple meals, and perform occasional chores such as peeling potatoes. (Tr. 66-67.) Zent stated that he was unable to do the grocery shopping but that he sometimes rode along in the car with his wife when she went to the store. (Tr. 67.)

Amy Kutschbach, the VE, testified about what types of work Zent may be able to carry out. (Tr. 82-84.) She identified Zent's past relevant work as a carpenter as a skilled job, heavy, both generally and as performed. (Tr. 84.) The VE then testified that there were no transferable skills from that job to sedentary work. (Tr. 84.)

**III. STANDARD OF REVIEW**

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id*. The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On November 28, 2008, the ALJ rendered his opinion. (Tr. 18-29.) He found at step one of the five-step analysis that Zent had not engaged in substantial gainful activity during the period from his alleged onset date of January 1, 2004, through his date last insured of June 30, 2004. (Tr. 22.) At step two, he determined that Zent was suffering from the following severe impairments: coronary artery disease, COPD, obstructive sleep apnea, diabetes mellitus type 2, hypertension, hyperlipidemia, and obesity. (Tr. 22.) At step three, he found that Zent did not

---

[5] Before performing steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC")—what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e).

9

have an impairment or combination of impairments that met or equaled a listing. (Tr. 22.) Before proceeding to step four, the ALJ determined that Zent had the RFC to perform the full range of sedentary work.

Based on this RFC and the VE's testimony, the ALJ found at step four that Zent could not perform his past relevant work as a carpenter. (Tr. 27.) At step five, he concluded that considering Zent's age, education, work experience, and RFC, he had acquired skills from his past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. The ALJ therefore concluded that Zent was not disabled within the meaning of the Social Security Act and his claim for DIB was denied. (Tr. 28-29.)

*C. The ALJ's Decision Must Be Remanded for Further Proceedings*

Zent offers several theories on how the ALJ erred. While many of Zent's arguments are not well-developed, Zent's claim that the ALJ erred when considering his age has merit and warrants a remand of the Commissioner's final decision. (Br. 23-25.) Specifically, Zent argues that the ALJ mechanically applied the Medical Vocational Guidelines to his borderline age situation. (Br. 23-25.)

The Social Security Regulations recognize that as a person ages, he is increasingly limited in his ability to adjust to new work. 20 C.F.R. § 404.1563(a). For example, the Regulations generally classify a claimant under the age of 50 as a "younger person," and presume that his age will not seriously affect his ability to adjust to other work. 20 C.F.R. § 404.1563(c). Alternatively, a claimant between the ages of 50 and 54 is classified as a "person closely approaching advanced age." 20 C.F.R. § 404.1563(c). The Regulations direct the Commissioner to consider that, along with any severe impairments and limited work experience,

10

such a claimant's age may seriously affect his ability to adjust to other work. *Id*. Finally, a claimant over 55 is considered to be a "person of advanced age," and the Commissioner must consider that such a claimant's age will significantly affect his ability to transition to other work. 20 C.F.R. § 404.1563(d).

A claimant's precise age can therefore be a crucial factor in determining eligibility for disability benefits. The Medical Vocational Guidelines, commonly referred to as the "grids," take into account a claimant's age, as well as the level of education, previous work experience, and the maximum level of work he may perform, to determine disability. *See* 20 C.F.R. § 404, Subpt. P, App. 2. The grids create a matrix that directs a finding of either "disabled" or "not disabled" based on a claimant's specific attributes. For example, Medical Vocational Guideline 201.19 directs a finding of not disabled for a "younger individual" limited to sedentary work, with a limited education, and non-transferable skills. 20 C.F.R. § 404, Subpt. P, App. 2. However, Medical Vocational Guideline 201.10 provides that an individual "closely approaching advanced age," but with the same limitation to sedentary work, limited education, and non-transferable skills, should be found disabled. *Id*.

Recognizing the potentially dispositive importance of a claimant's age, the Regulations direct the ALJ to "not apply these age categories mechanically in a borderline situation." 20 C.F.R. § 404.1563(b). *See also Heckler v. Campbell*, 461 U.S. 458, 462 (1983); *Graham v. Massanari*, No. 00 C 4669, 2001 WL 527326, at *8 (N.D. Ill. May 9, 2001). Rather, "if [the claimant is] within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [he is] disabled, [the ALJ] will consider whether to use the older age category after evaluating the overall impact of all the

11

factors of [the claimant's] case." 20 CFR § 404.1563(b). *See also* SSR 82-46(c); *Hawkins v. Apfel*, No. 97 C 6760, 1998 WL 378421, at *1 (N.D. Ill. July 1, 1998).

Zent argues that the ALJ mechanically applied the Medical Vocational Guidelines to his borderline age situation. He points out that he was 49 years old and classified as a "younger individual" as of his date last insured of June 30, 2004, but that he turned 50 on August 30, 2004, and was then re-classified as "an individual closely approaching advanced age." (Br. 23.) Zent argues that the ALJ committed error when he mechanically applied the "younger individual" classification to him, without considering that a borderline age situation existed. "If the ALJ had considered Mr. Zent as a person 'closely approaching advanced age,' Medical Vocational Rule 201.10 would have directed a conclusion of disabled in light of Mr. Zent's past-work experience and limitation to sedentary work." (Br. 23.)

The Commissioner does not dispute that a borderline age situation exists. (Resp. Br. 20.) Rather, he argues that the ALJ did not commit error by failing to explicitly discuss why he applied Zent's chronological age of 49 and classified him as a "younger individual" instead of re-classifying him as an "individual closely approaching advanced age." (Resp. Br. 20.)

Zent's argument ultimately has merit. Although case law on this issue has not been well-developed in the Seventh Circuit, district courts have reversed and remanded an ALJ's decision where a borderline age situation exists but there is no evidence the ALJ considered the issue. In *Freundt v. Massanari*, No. 00 C 4456, 2001 WL 1356146, at *17-20 (N.D. Ill. Nov. 2, 2001), the Court remanded the ALJ's opinion for further consideration because, in part, "there is nothing in the ALJ's opinion to suggest . . . that he considered the 'borderline' issue at all." *Id.* at *19. In reaching this conclusion, the Court adopted the reasoning of the decision of the Tenth Circuit

Court of Appeals in *Daniels v. Apfel*, 154 F.3d 1129, 1133-34 (10th Cir. 1998), which held that the Commissioner must discuss the borderline age situation whenever the claimant is within a few days or months of the next age category and applying the next category would result in a different disability determination. *Freundt*, 2001 WL 1356146, at *19 (citing *Daniels*, 154 F.3d at 1136.) Similarly, in *Graham v. Massanari*, the Court remanded the case after finding that "[t]here is no evidence or indication in the record that the ALJ ever considered the borderline regulation . . . ." 2001 WL 527326, at *8.

In the present case, the Court simply cannot trace the ALJ's reasoning regarding Zent's age classification. The ALJ's decision merely states that: "The claimant was born on August 30, 1954, and was 50 years old, which is defined as a younger individual age 45-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 404.1563)." The Commissioner argues that this rather summary discussion of Zent's age "indicates that the ALJ was aware of [Zent's] borderline age situation and reasonably implies that [the ALJ] appropriately considered his borderline age situation prior to applying the Medical Vocational Guidelines." (Resp. Br. 23.)

To the contrary, the ALJ's treatment of Zent's borderline age situation appears to be the "mechanical" application of the age categories that the ALJ is specifically directed to avoid. *See Heckler*, 461 U.S. at 462; *Graham*, 2001 WL 527326, at *8; 20 C.F.R. § 404.1563(b). A mere mention of Zent's age and a citation to the statute governing age as a vocational factor do not allow the Court to trace the ALJ's reasoning as to why he decided not to re-classify Zent as an "individual closely approaching advanced age." *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) ("We recognize that even a 'sketchy opinion' is sufficient if it

13

assures us that an ALJ considered the important evidence and enables us to trace its reasoning. But in this case, the conclusory and conflated analysis prevents this court from finding that substantial evidence supports the ALJ's conclusions." (internal citation omitted)); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) ("We have repeatedly admonished ALJs to 'sufficiently articulate [their] assessment of the evidence to assure us that [they] considered the important evidence and . . . to enable us to trace the path of [their] reasoning.'") (quoting *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)). Accordingly, the ALJ's decision cannot be said to be based on substantial evidence, and this case must be remanded for further proceedings and consideration of Zent's borderline age situation.[6] On remand, the Court's ruling does not require the ALJ to automatically re-classify Zent as an "individual closely approaching advanced age," but to merely consider whether Zent *should* be re-classified.

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED and this case is REMANDED so that the ALJ may specifically address Zent's borderline age situation. The Clerk is directed to enter a judgment in favor of Zent and against the Commissioner.

SO ORDERED

December 16, 2010

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge

---

[6] This Opinion and Order should not be construed as creating any general standard or rule on how an ALJ must discuss a borderline age situation in future cases. Rather, the Court simply holds that based on the particular and unique facts of this case, the ALJ's decision requires remand for further consideration of the claimant's borderline age situation.